Accelerando, Inc. v. Relentless Sols., Inc., 2025 NCBC 29.

STATE OF NORTH CAROLINA

GUILFORD COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
24CV028428-400

ACCELERANDO, INC.,

Plaintiff,

v.

RELENTLESS SOLUTIONS, INC.
and ROBERT YODER,

Defendants.

**ORDER AND OPINION ON
DEFENDANT ROBERT YODER'S
MOTION FOR JUDGMENT ON THE
PLEADINGS**

1. **THIS MATTER** is before the Court on the 14 March 2025 filing of *Defendant Robert Yoder's Motion for Judgment on the Pleadings* (the Motion). (ECF No. 19 [Mot.].) Pursuant to Rule 12(c) of the North Carolina Rules of Civil Procedure (the Rule(s)), Defendant Robert Yoder (Yoder) requests that the Court dismiss with prejudice the claims asserted against him by Plaintiff Accelerando, Inc. (Plaintiff). (Mot. 1–2.)

2. For the reasons set forth herein, the Court **GRANTS** in part and **DENIES** in part the Motion.

> *Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P. by Jennifer K. Van Zant and Amanda S. Hawkins, for Plaintiff Accelerando, Inc.*
>
> *Randolph M. James, P.C. by Randolph M. James, for Defendant Robert Yoder.*

Robinson, Chief Judge.

## I. INTRODUCTION

3. This action arises out of Plaintiff's contention that Yoder, a former employee, left to work for a competitor, Defendant Relentless Solutions, Inc.

(Relentless), taking with him Plaintiff's trade secrets and confidential information in violation of restrictive covenants found within his subcontractor agreement with Plaintiff. Plaintiff also contends Yoder has wrongfully interfered with its service contracts with its customers by inducing them to terminate those service contracts to work with Relentless instead.

## II. FACTUAL BACKGROUND

4. The Court does not make findings of fact on a Rule 12(c) motion for judgment on the pleadings. The following factual background is drawn from the pleadings and matters of record that are properly considered, relevant, and necessary to the Court's consideration of the Motion.

### A. The Parties

5. Plaintiff is a North Carolina corporation with its principal place of business in Guilford County, North Carolina. (Am. Compl. ¶ 1, ECF No. 14 [Am. Compl.].)

6. Relentless is a Florida corporation with its principal office in North Miami, Florida. (Am. Compl. ¶ 2.)

7. Yoder is a resident of Forsyth County, North Carolina. (Am. Compl. ¶ 3.)

### B. Plaintiff's Business Relationship with Relentless

8. Plaintiff, with the authorization of NCR Corporation (NCR), "provides software and services to businesses that license NCR Counterpoint[,]" a point-of-sale software product and intellectual property owned by NCR. (Am. Compl. ¶¶ 9–11.) "The products and services [Plaintiff] provides are highly specialized, and are targeted to clients who use NCR Counterpoint." (Am. Compl. ¶ 12.)

9. Approximately thirty companies worldwide, including Plaintiff and Relentless, have been authorized by NCR "to sell products and provide service to customers using NCR Counterpoint within certain geographic regions." (Am. Compl. ¶¶ 10–11.) Relentless is also authorized to provide NCR Counterpoint products and services. (Am. Compl. ¶ 13.)

10. On 24 August 2017, Plaintiff and Relentless entered into the Ecommerce 4 Counterpoint Reseller Agreement (the E4CP Agreement), which remains in effect. (Am. Compl. ¶ 18.)

11. Pursuant to the E4CP Agreement, Plaintiff authorized Relentless "to resell certain products that [Plaintiff] creates for use with NCR's Counterpoint" (the E4CP Products). (Am. Compl. ¶ 19.)

12. As a condition of receiving a license to resell the E4CP Products, the E4CP Agreement includes a confidentiality provision whereby Relentless "agreed that it would not use in competition [Plaintiff's] confidential business information, including [Plaintiff's] price lists, data, marketing materials, and business plans." (Am. Compl. ¶¶ 20–21.) This provision expressly excludes "information that is publicly known or otherwise available through lawful means, or information that Relentless independently developed." (Am. Compl. ¶ 21.)

C. **Yoder's Employment with Plaintiff**

13. Yoder began working for Plaintiff around 15 November 2009. (Am. Compl. ¶ 15.) At the time of his resignation, Yoder was Plaintiff's Vice President of

Platform Services, through which he had access to Plaintiff's confidential information and clients. (Am. Compl. ¶ 15.)

14. In November 2009, Yoder executed a Subcontractor Non-Compete Agreement (the Non-Compete Agreement). (Am. Compl. ¶ 38; *see* Am. Compl. Ex. A., ECF No. 14.1 [Non-Compete Agt.].)

15. The Non-Compete Agreement includes the following covenant against competition:

> A. During the period of Subcontractor's contractual relationship with the Company and for a period of twenty-four (24) months after the termination of agreement . . . Subcontractor shall not directly or indirectly, either for Subcontractor's own account or as a partner, shareholder (other than shares regularly traded in a recognized market), officer, subcontractor, agent or otherwise, provide services or other to any of the Company's customers, clients or accounts that might be considered competitive in nature. By way of example, and not as a limitation, the foregoing shall preclude Subcontractor from soliciting business or sales from, or attempting to convert to other sellers or providers of the same or similar products or services as provided by the Company, any customer, client, or account of the Company.

(Non-Compete Agt. at 1.)

16. The Non-Compete Agreement also includes the following confidentiality provision:

> C. During the period of the Subcontractor's contractual relationship with the Company, and thereafter for seven (7) years, Subcontractor shall not disclose to anyone any Confidential Information. For the purposes of this Agreement, "Confidential Information" shall include any of the Company's confidential, proprietary or trade secret information that is disclosed to Subcontractor or Subcontractor otherwise learns in the course of employment such as, but not limited to, business plans, customer lists, financial statements, software diagrams, flow charts and product plans.

(Non-Compete Agt. at 2.) The confidentiality provision expressly excludes information that "(i) is or becomes publicly available through no act of Subcontractor, (ii) is rightfully received by Subcontractor from a third party without restrictions[,] or (iii) is independently developed by Subcontractor." (Non-Compete Agt. at 2.)

**D.** **Yoder Resigns from Employment with Plaintiff and Begins Work for Relentless**

17. Plaintiff alleges, upon information and belief, that Yoder met with Relentless at its headquarters in Florida in December 2021 and that, shortly thereafter, Yoder accepted a position with Relentless. (Am. Compl. ¶¶ 41–42.)

18. On or about 14 March 2022, Yoder informed Plaintiff that he was resigning. (Am. Compl. ¶ 43.)

19. At some point after resigning from his employment with Plaintiff, Yoder began working for Relentless as a Solutions Architect L3. (Am. Compl. ¶ 16.)

20. Plaintiff alleges that its President, Craig Castor, asked Yoder when he resigned whether he was leaving to work for Relentless and that Yoder "lied and said he was not." (Am. Compl. ¶ 43.)

21. The same day that he resigned, Yoder forwarded certain information regarding Plaintiff's then-customer Frham to his personal email address, including "an internal Accelerando service ticket, which included Frham's customer contact information." (Am. Compl. ¶ 45.) Yoder "also forwarded to his personal email customer contact information for then-Accelerando customer Girl Scouts Carolinas Peaks to Piedmont." (Am. Compl. ¶ 46.) Plaintiff alleges that the customer information taken by Yoder is confidential. (*See* Am. Compl. ¶ 45.)

22. Plaintiff further alleges, upon information and belief, that Yoder "also stole additional confidential and trade secret information" from Plaintiff and that he took this information to use for Relentless' benefit. (Am. Compl. ¶¶ 47–48.)

### E. Other Employees Depart Plaintiff and Join Relentless

#### 1. Scott Muller

23. Scott Muller (Muller) began working for Plaintiff in 2005 as an account manager and later became a vice president of the company. (Am. Compl. ¶ 22.)

24. Muller resigned his employment with Plaintiff in 2012 "after an argument with [Plaintiff's] President over his authority and compensation." (Am. Compl. ¶ 23.) Plaintiff alleges that, before leaving, Muller threatened that "he would steal [Plaintiff's] customers if he left." (Am. Compl. ¶ 23.)

25. Upon leaving his employment with Plaintiff, Muller "began working for one of [Plaintiff's] clients" and, shortly thereafter, Muller, "through his employer, fired [Plaintiff]." (Am. Compl. ¶ 24.)

26. In or around June 2021, Muller was hired as Vice President of Business Development at Relentless. (Am. Compl. ¶ 25.) Plaintiff alleges, upon information and belief, that approximately three months later, in or around September 2021, Muller became Relentless' Chief Operations Officer. (Am. Compl. ¶ 25.)

#### 2. Dana Dollaeye

27. In or around September 2021, Dana Dollaeye (Dollaeye) was hired as the Vice President of Client Delivery Service of Relentless. (Am. Compl. ¶ 26.)

28. Dollaeye was previously employed by Plaintiff, where she worked "in a nearly identical role, as [Plaintiff's] Vice President of Client Delivery Service and an officer of [Plaintiff]." (Am. Compl. ¶ 27.) Dollaeye resigned from her employment with Plaintiff on 14 September 2021. (Am. Compl. ¶ 29.)

29. In her role as Plaintiff's Vice President of Client Delivery Service, Dollaeye "had access to [Plaintiff's] confidential information, and was in charge of managing [Plaintiff's] client service protocols. Nearly all of [Plaintiff's] employees reported directly to her, including [Plaintiff's] Knowledge Services Professionals, service managers, and subcontractors." (Am. Compl. ¶ 28.) Dollaeye, in this role, "also had access to all information regarding rates of pay, benefit classes, and history of compensation for every employee." (Am. Compl. ¶ 28.)

30. After tendering notice, but prior to leaving employment with Plaintiff, Dollaeye emailed to her personal email certain information which Plaintiff alleges constitutes its confidential and trade secret information. (Am. Compl. ¶ 30.) Plaintiff specifically alleges that Dollaeye emailed herself a host of sensitive documents including internal best practices and policies, work templates, job descriptions, and other internal documents (collectively, the Customer Service Protocols). (*See* Am. Compl. ¶ 30.) Plaintiff alleges it has "developed and honed" these materials over the course of more than two decades. (Am. Compl. ¶ 30.)

31. Only service management employees of Plaintiff have access to the Customer Service Protocols, and the materials are password protected and are not shared outside the company. (Am. Compl. ¶ 33.)

32. Plaintiff further alleges, upon information and belief, that Dollaeye "forwarded and stole additional trade secret materials" from Plaintiff and that she took this information to use for Relentless' benefit. (Am. Compl. ¶¶ 34–35.)

**F.    Plaintiff's Customers Leave to Work with Relentless**

33. Plaintiff alleges that the following customers have left Plaintiff to work with Relentless: (1) Girl Scouts Carolinas Peaks to Piedmont (Girl Scouts), (2) Frham, (3) Shore Décor, and (4) So-Mo Agri Supply. (Am. Compl. ¶ 54.)

## III.    PROCEDURAL BACKGROUND

34. On 23 December 2024, Plaintiff initiated this action upon the filing of the Verified Complaint. (ECF No. 3.)

35. On 21 February 2025, Plaintiff filed the Amended Complaint as a matter of right. (ECF No. 14.)

36. On 14 March 2025, Yoder filed an answer to the Amended Complaint. (ECF No. 18.) That same day, Yoder filed the Motion.

37. After full briefing, the Court held a hearing on the Motion on 6 June 2025 (the Hearing), where all parties were represented by counsel. (*See* ECF No. 30.)

38. The Motion is ripe for resolution.

## IV.    LEGAL STANDARD

39. "A motion for judgment on the pleadings should not be granted unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law." *Carpenter v. Carpenter*, 189 N.C. App. 755, 761 (2008) (citation omitted). On a Rule 12(c) motion, "[t]he movant is held

to a strict standard and must show that no material issue of facts exists and that he is clearly entitled to judgment." *Ragsdale v. Kennedy*, 286 N.C. 130, 137 (1974) (citation omitted). "[T]he court cannot select some of the alleged facts as a basis for granting the motion on the pleadings if other allegations, together with the selected facts, establish material issues of fact." *J. F. Wilkerson Contracting Co. v. Rowland*, 29 N.C. App. 722, 725 (1976). The Court must read the pleadings in the light most favorable to the nonmoving party, and

> [a]ll well pleaded factual allegations in the nonmoving party's pleadings are taken as true and all contravening assertions in the movant's pleadings are taken as false. All allegations in the nonmovant's pleadings, except conclusions of law, legally impossible facts, and matters not admissible in evidence at the trial, are deemed admitted by the movant for purposes of the motion.

*Ragsdale*, 286 N.C. at 137 (citations omitted). When ruling on a motion for judgment on the pleadings, the Court "is to consider only the pleadings and any attached exhibits, which become part of the pleadings." *Cash v. State Farm Mut. Auto. Ins. Co.*, 137 N.C. App. 192, 202 (2000) (citation and quotation marks omitted).

40. "Judgment on the pleadings is not favored by the law . . . ." *Huss v. Huss*, 31 N.C. App. 463, 466 (1976). The function of Rule 12(c) "is to dispose of baseless claims or defenses when the formal pleadings reveal their lack of merit." *Ragsdale*, 286 N.C. at 137. "[J]udgment on the pleadings is not appropriate merely because the claimant's case is weak and he is unlikely to prevail on the merits." *Huss*, 31 N.C. App. at 469. "A motion for judgment on the pleadings is allowable only where the pleading of the opposite party is so fatally deficient in substance as to present no material issue of fact[.]" *Dobias v. White*, 239 N.C. 409, 412 (1954) (citation omitted).

## V. ANALYSIS

41. Yoder seeks judgment on the pleadings as to each of the following claims asserted against him by Plaintiff: (1) breach of restrictive covenants related to the Non-Compete Agreement (Am. Compl. ¶¶ 67–74), (Count Two); (2) wrongful interference with contract (Am. Compl. ¶¶ 82–88), (Count Four); (3) unfair and deceptive trade practices pursuant to N.C.G.S. § 75-1.1, *et seq.* (Am. Compl. ¶¶ 89–96), (Count Five); (4) unjust enrichment (Am. Compl. ¶¶ 97–101), (Count Six); and (5) permanent injunction (Am. Compl. ¶¶ 102–05), (Count Seven)[1]. The Court will address each claim in turn.

### A. <u>Count Two: Breach of Restrictive Covenants</u>

42. Plaintiff asserts Count Two against Yoder for breach of the Non-Compete Agreement, alleging that the Non-Compete Agreement is a "valid and enforceable contract" and that Yoder breached both the non-compete and confidentiality provisions contained therein. (Am. Compl. ¶¶ 69–73.) Specifically, Plaintiff alleges Yoder breached the Non-Compete Agreement by "working for Relentless, [Plaintiff's] competitor, in a nearly identical position, immediately after he stopped working for [Plaintiff][,]" and by "disclosing [Plaintiff's] confidential information to Relentless." (Am. Compl. ¶¶ 72–73.)

43. To properly plead a breach of contract claim, the claimant must allege "(1) [the] existence of a valid contract and (2) [a] breach of the terms of that contract."

---

[1] The request for permanent injunction, which makes up the seventh claim for relief, was misnamed as a claim for unjust enrichment in the Amended Complaint.

*Poor v. Hill*, 138 N.C. App. 19, 26 (2000) (citing *Jackson v. Cal. Hardwood Co.*, 120 N.C. App. 870, 871 (1995)). "[S]tating a claim for breach of contract is a relatively low bar." *Vanguard Pai Lung, LLC v. Moody*, 2019 NCBC LEXIS 39, at *11 (N.C. Super. Ct. June 19, 2019).

### 1. Non-Competition Provision

44. Covenants not to compete are generally "not viewed favorably in modern law." *VisionAIR, Inc. v. James*, 167 N.C. App. 504, 508 (2004) (citation and quotation marks omitted). "To be enforceable, a covenant not to compete must be (1) in writing; (2) reasonable as to time and territory; (3) made a part of the employment contract; (4) based on valuable consideration; and (5) designed to protect a legitimate business interest of the employer." *Young v. Mastrom, Inc.*, 99 N.C. App. 120, 122–23 (1990), *disc. review denied*, 327 N.C. 488 (1990). If the covenant "is too broad to be a reasonable protection to the employer's business it will not be enforced." *VisionAIR*, 167 N.C. App. at 508 (citation and quotations omitted).

45. Yoder contends the covenant not to compete contained in the Non-Compete Agreement is unenforceable as a matter of law. (Def. Robert Yoder's Br. Supp. Mot. 4, ECF No. 20 [Br. Supp.].) Specifically, Yoder argues the non-compete provision is facially overbroad in that it purports to bar Yoder from directly or indirectly providing services "to any of the Company's customers, clients or accounts that might be considered competitive in nature" for two years, "regardless of whether Yoder worked with that specific customer while employed with [Plaintiff]." (Br. Supp. 4–5.) Additionally, Yoder argues that the non-competition provision is overbroad as to

territory as it contains no limitation on geographic scope and thus is, in essence, a worldwide restriction.  (Br. Supp. 6–7.)

46.    Plaintiff argues in response that the non-compete agreement is not overbroad as it does not bar Yoder from owning shares in a mutual fund that invests in a competitor or from accepting employment beyond the scope of the work he did for Plaintiff.  (Memo. Opp'n Mot. 5, ECF No. 23 [Br. Opp.].)  Additionally, Plaintiff contends the provision is not overbroad because it does not prohibit Yoder from working for Plaintiff's competitors but rather only prohibits him from providing services to Plaintiff's customers, clients, or accounts.  (Br. Opp. 5.)  Further, Plaintiff argues the mere use of the phrase "direct or indirect" does not render the covenant unenforceable.  (Br. Opp. 7.)

47.    The Court disagrees with Plaintiff and determines that the provision is unreasonably overbroad.  As an initial matter, the provision purports to prohibit Yoder from indirectly competing with Plaintiff.  *See, e.g., Cnty. of Wake PDF Elec. & Supply Co., LLC v. Jacobsen*, 2020 NCBC LEXIS 103, at *19–20 (N.C. Super. Ct. Sept. 9, 2020) (finding unenforceable a non-compete covenant restricting an employee from competing "directly or indirectly" with a former employer); *NFH, Inc. v. Troutman*, 2019 NCBC LEXIS 66, at *38–39 (N.C. Super. Ct. Oct. 29, 2019); *Akzo Nobel Coatings, Inc. v. Rogers*, 2011 NCBC LEXIS 42, at **31–32 (N.C. Super. Ct. Nov. 3, 2011) ("North Carolina courts have refused to enforce noncompetition clauses using the terms 'directly or indirectly.' " (citations omitted)).

48. The provision also prohibits Yoder from providing services to Plaintiff's customers, clients, or accounts "that might be considered competitive in nature." While Plaintiff contends the term "services" in this context means only those same services Yoder provided while employed by Plaintiff, the Court notes that the Non-Compete Agreement does not expressly define the term "services," nor does it identify which individual or entity is to determine what services "might be considered competitive in nature." This language, coupled with the use of the phrase "directly or indirectly," is overbroad and does not reasonably put Yoder on notice of what services he is prohibited from providing.

49. Additionally, the language of the non-competition provision is unclear as to the temporality of the phrase "any of the Company's customers, clients or accounts[.]" In other words, it is unclear whether Yoder is prohibited from providing competitive services to any customer or client who has ever worked with Plaintiff, including those who have since ceased working with Plaintiff or who became a customer or client after Yoder's employment with Plaintiff ended, or whether the prohibition is limited to those customers, clients, and accounts who were serviced by Plaintiff specifically during the period of Yoder's employment.

50. Further, the last sentence of the non-competition provision states, "[b]y way of example, and not as a limitation, the foregoing shall preclude Subcontractor from soliciting business or sales from, or attempting to convert to other sellers or providers of the same or similar products or services as provided by the Company, any customer, client, or account of the Company." (Non-Compete Agt. at 1.) The inclusion

of this specific example of what constitutes a violation of the non-competition provision does not save the provision from being overbroad as a whole and unenforceable as a matter of law. The Court, in its discretion, will not apply the blue pencil doctrine to the non-competition provision.

51. Therefore, the Court **GRANTS** in part the Motion as to Count Two and dismisses that claim to the extent it is based on a breach of the non-competition restrictive covenant contained in the Non-Compete Agreement.

### 2. Confidentiality Provision

52. Yoder argues Count Two fails as to Plaintiff's claim that he breached the confidentiality provision of the Non-Compete Agreement because (1) Plaintiff failed to allege how Yoder stole confidential and trade secret information; and (2) the information Yoder was alleged to have taken, an internal service ticket including Frham's customer contact information and customer contact information for Girl Scouts, does not constitute confidential information or trade secrets as it is generic business information which can be found online. (Br. Supp. 9–10.)

53. In response, Plaintiff notes that it has not pled a claim for misappropriation of trade secrets against Yoder and the "bulk of Yoder's arguments are therefore irrelevant to whether [Plaintiff] pled a breach of the parties' confidentiality agreement, and should be ignored." (Br. Opp. 9.) Plaintiff contends it has sufficiently pled a breach of the confidentiality provision because it has alleged that the parties had a valid, enforceable contract and "that Yoder breached that contract by, at a minimum, stealing [Plaintiff's] confidential customer contact information, providing

it to Relentless, and using it to assist Relentless in stealing those customers from [Plaintiff]." (Br. Opp. 10.) Additionally, Plaintiff claims the argument that the information Yoder stole does not amount to confidential information is a premature merits argument. (Br. Opp. 12.)

54. The Court agrees with Plaintiff. At this stage, the allegations in the Amended Complaint for breach of the confidentiality provision in the Non-Compete Agreement are sufficient. Plaintiff has alleged both the existence of a valid and enforceable agreement[2] and that Yoder has breached the confidentiality agreement by disclosing to Relentless certain confidential customer information that he forwarded to his personal email prior to concluding his employment with Plaintiff.

55. Therefore, the Court **DENIES** in part the Motion as to Count Two for breach of the confidentiality provision contained in the Non-Compete Agreement.

## B. Count Four: Wrongful Interference with Contract

56. Plaintiff brings Count Four for wrongful interference with contract against Yoder, alleging that (1) valid contracts existed between Plaintiff and the following customers for the provision of Counterpoint-related services: Girl Scouts, Frham, Shore Décor, and So-Mo Agri Supply; (2) Yoder knew that Plaintiff had contracts with these customers; (3) Yoder, along with Relentless, used Plaintiff's confidential and trade secret information in violation of his confidentiality agreement to intentionally induce these customers to terminate their contracts with Plaintiff; and (4) Yoder had

---

[2] At the Hearing, Yoder argued that no valuable consideration was given because the Non-Compete Agreement was signed before Yoder was a full-time employee of Relentless. However, as this argument was not properly raised in Yoder's briefing of the Motion, the Court will not consider the argument at this time.

no legal justification for interfering with Plaintiff's customers through the misuse of Plaintiff's confidential and trade secret information, which Yoder was contractually bound to protect.  (Am. Compl. ¶¶ 83–85, 87.)

57.    To state a claim for tortious interference with contract, a plaintiff must allege the following: (1) a valid contract exists between the plaintiff and a third person; (2) the defendant knows of the contract between plaintiff and the third party; (3) the defendant intentionally induces the third person not to perform the contract; (4) the defendant in doing so acts without justification; and (5) the interference results in actual damage to the plaintiff.  *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 661 (1988) (citing *Childress v. Abeles*, 240 N.C. 667, 674 (1954)).  As this Court has previously noted, "[t]he pleading standards for a tortious interference with contract claim are strict."  *Urquhart v. Trenkelbach*, 2017 NCBC LEXIS 12, at *15 (N.C. Super. Ct. Feb. 8, 2017); *see also Wells Fargo Ins. Servs. USA v. Link*, 2018 NCBC LEXIS 42, at *47 (N.C. Super. Ct. May 8, 2018); *Kerry Bodenhamer Farms, LLC v. Nature's Pearl Corp.*, 2017 NCBC LEXIS 27, at *16 (N.C. Super. Ct. Mar. 27, 2017).

58.    Yoder argues this claim fails because Plaintiff does not allege how Yoder induced these customers to terminate their contracts with Plaintiff.  (Br. Supp. 12.) Additionally, Yoder contends Plaintiff has failed to allege malice because Plaintiff and Relentless are competitors.  (Br. Supp. 13.)

59.    "Claims for tortious interference with contract . . . are properly dismissed under Rule 12(c) where the complaint shows that the interference was justified or

privileged." *K&M Collision, LLC v. N.C. Farm Bureau Mut. Ins. Co.*, 2017 NCBC LEXIS 109, at *20 (N.C. Super. Ct. Nov. 21, 2017) (citation omitted).  While the Court recognizes that there is a "general principle that interference may be justified when the plaintiff and defendant are competitors[,]" competition in business only constitutes justifiable interference so long as it is carried on in furtherance of one's own interests and *by means that are lawful*." *Peoples Sec. Life Ins. Co. v. Hooks*, 322 N.C. 216, 221–22 (1988) (emphasis added).  Thus, to the extent Yoder contends Plaintiff has failed to allege malice because Plaintiff and Relentless are competitors, that argument does not pass muster as Plaintiff has alleged Yoder and Relentless, through unlawful means, have intentionally induced Plaintiff's customers to terminate their service agreements.

60.     Furthermore, as to how Yoder induced customers to leave, Plaintiff has specifically alleged that because Yoder knew who Plaintiff's customers were and how Plaintiff's software worked, "[h]e was thus able to solicit [Plaintiff's] customers and encourage them to work for Relentless."  (Am. Compl. ¶ 53.)

61.     Reading the allegations of the Amended Complaint in the light most favorable to Plaintiff, the Court concludes that the allegations are sufficient at this stage to state a claim for tortious interference with the service contracts between Plaintiff and Girl Scouts, Frham, Shore Décor, and So-Mo Agri Supply.

62.     Therefore, the Court **DENIES** the Motion as to Count Four for tortious interference with contract.

## C.     Count Five: Unfair and Deceptive Trade Practices

63.     Plaintiff alleges that the conduct of Yoder complained of in the Amended Complaint "is oppressive and substantially injurious to customers and, therefore, unfair under N.C.[G.S.] § 75-1.1." (Am. Compl. ¶ 90.) Additionally, Plaintiff contends that Yoder's wrongful interference with Plaintiff's contracts with its customers constitutes an unfair method of competition and unfair or deceptive trade practice. (Am. Compl. ¶¶ 91–92.)

64.     "To prevail on a claim of unfair and deceptive trade practices a plaintiff must show (1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or to his business." *Spartan Leasing, Inc. v. Pollard*, 101 N.C. App. 450, 460–61 (1991) (citing *Marshall v. Miller*, 302 N.C. 539 (1981)).

65.     Chapter 75 of the North Carolina General Statutes (UDTPA) provides, in pertinent part, that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C.G.S.  § 75-1.1(a).   Further, the UDTPA defines "commerce" to include "all business activities, however denominated, but does not include professional services rendered by a member of a learned profession."  N.C.G.S. § 75-1.1(b).

66.     "North Carolina courts have previously concluded that when the UDTP[A] claim rests solely upon other claims . . . which the court determines should be dismissed, the UDTP[A] claim must fail as well." *Chara, LLC v. Sequoia Servs., LLC*, 2020 NCBC LEXIS 52, at *19 (N.C. Super. Ct. Apr. 17, 2020).

67. Because the Court has concluded that Plaintiff's claim against Yoder for tortious interference with contract survives the Motion, the UDTPA claim also survives at this stage.

68. Therefore, the Court **DENIES** the Motion as to Count Five for violation of the UDTPA.

## D. Count Six: Unjust Enrichment

69. Plaintiff brings Count Six for unjust enrichment against Yoder, alleging Yoder "received the benefit of [Plaintiff's] trade secrets and confidential information" by using the alleged trade secrets and confidential information to solicit Plaintiff's customers when he was not entitled to do so. (Am. Compl. ¶¶ 98–100.)

70. "In North Carolina, to recover on a claim of unjust enrichment, Plaintiff must prove: (1) that it conferred a benefit on another party; (2) that the other party consciously accepted the benefit; and (3) that the benefit was not conferred gratuitously or by an interference in the affairs of the other party." *Jacobsen*, 2020 NCBC LEXIS 103, at \*29 (citing *Southeastern Shelter Corp. v. BTU, Inc.*, 154 N.C. App. 321, 330 (2002)). The benefit must be measurable. *Krawiec v. Manly*, 370 N.C. 602, 615 (2018).

71. "A claim for unjust enrichment 'is neither in tort nor contract but is described as a claim in quasi contract or a contract implied in law.' " *Jacobsen*, 2020 NCBC LEXIS 103, at \*28 (quoting *Booe v. Shadrick*, 322 N.C. 567, 570 (1988)). " 'The general rule of unjust enrichment is that where services are rendered and expenditures made by one party to or for the benefit of another, without an express

contract to pay, the law will imply a promise to pay a fair compensation therefor.' " *Krawiec*, 370 N.C. at 615 (quoting *Atlantic C. L. R. Co. v. State Highway Comm'n*, 268 N.C. 92, 95–96 (1966) (citation omitted)).

72.     Plaintiff's claim of unjust enrichment is based on its allegation that Yoder benefited from his alleged intentional misuse of Plaintiff's confidential information. As a result, any benefit Yoder obtained was taken by Yoder as opposed to being conferred upon him by Plaintiff.   *See KNC Techs., LLC v. Tutton*, 2019 NCBC LEXIS 72, at *37 (N.C. Super. Ct. Oct. 9, 2019) (dismissing unjust enrichment claim where the plaintiff only alleged the defendants took some benefit for themselves for which plaintiff believed it should be awarded damages); *Am. Cirs., Inc. v. Bayatronics, LLC*, 2023 NCBC LEXIS 165, at **39–40 (N.C. Super. Ct. Dec. 8, 2023) (holding the alleged wrongful taking and dissemination of information in violation of a confidentiality agreement did not support a claim for unjust enrichment because no benefit had been conferred); *A Distrib. Co. v. Mood Prod. Grp. LLC*, 2024 NCBC LEXIS 130, at **25–26 (N.C. Super. Ct. Sept. 26, 2024) (dismissing unjust enrichment claim where the defendant was alleged to have taken a benefit for itself through the fraudulent use of the plaintiff's certificates).

73.     As such, Plaintiff has failed to state a claim for unjust enrichment. Therefore, the Court **GRANTS** the Motion as to Count Six, and Count Six for unjust enrichment is dismissed with prejudice.

**E. Count Seven: Permanent Injunction**

74. Plaintiff asks the Court to enforce the Non-Compete Agreement by entering a permanent injunction forbidding Yoder from using Plaintiff's confidential or trade secret information or providing the same "to anyone other than [Plaintiff], and to return without retaining copies of [Plaintiff's] trade secret and confidential and proprietary information, and all other of [Plaintiff's] property, documents, data, and files." (Am. Compl. ¶ 103.)

75. Injunctive relief "is an ancillary remedy, not an independent cause of action." *Revelle v. Chamblee*, 168 N.C. App. 227, 230 (2005) (citation omitted). It is well-settled that "injunctive relief is not a standalone claim[.]" *Window World of St. Louis, Inc. v. Window World of Bloomington, Inc.*, 2021 NCBC LEXIS 88, at *15 (N.C. Super. Ct. Oct. 6, 2021).

76. Accordingly, the Court hereby **GRANTS** the Motion as to Count Seven, and Count Seven for permanent injunctive relief is dismissed without prejudice to Plaintiff's ability to seek this remedy at a later time if warranted by the relevant facts and law.

## VI. CONCLUSION

77. For the foregoing reasons, the Court hereby **GRANTS** in part and **DENIES** in part the Motion as follows:

    a. The Court **GRANTS** the Motion in part as to Count Two to the extent it is based on a breach of the non-competition restrictive covenant

contained in the Non-Compete Agreement, and that claim is **DISMISSED** with prejudice to that limited extent;

b.      The Court **GRANTS** the Motion as to Count Six for unjust enrichment, and that claim is **DISMISSED** with prejudice;

c.      The Court **GRANTS** the Motion as to Count Seven for permanent injunction, and that claim is **DISMISSED** without prejudice; and

d.      Except as herein granted, the Motion is hereby **DENIED**.

**SO ORDERED**, this the 19th day of June, 2025.


/s/ Michael L. Robinson
Michael L. Robinson
Chief Business Court Judge